313-0510, People of the State of Illinois, Appalachia, by Mark Osdall v. Cody Thomas and Helen, by Josette Skelnick. Ms. Skelnick?  Good morning. We're on the other side in Elgin, so we're looking the wrong way. My name is Josette Skelnick. I'm with the Office of the State Appellate Defender, and I'm here this morning on behalf of Cody Thomas. Mr. Thomas was convicted after a bench trial of two counts of attempt, aggravated criminal sexual assault, and one count of aggravated battery. He was sentenced to consecutive terms of ten years, ten years, and five years imprisonment on those counts. The state agrees with the defense that at least one of the defendant's convictions for attempt must be vacated under one Act I crime principles. But we are asking your honors to not only vacate, but to reverse both the attempt convictions on the ground that the state failed to prove beyond a reasonable doubt that Cody Thomas was acting with the intent to commit a sexual assault against his friend, Sophia Antero. What was his intent as you say it? He testified at trial and explained what had happened, and I believe that the evidence, even Sophia's testimony herself, but the evidence is consistent with his version of events, which was that a lot of it was undisputed. The two of them were drinking all evening in a bar. Both of them were essentially drunk. They decided to take a cab back to Sophia's home. Cody said he was going to walk from her parents' home to his home because he lived in the area. They didn't have the appropriate money for a cab, so they went to a Quick Sam's where Cody got money to pay for the cab. They then decided to walk back to Sophia's parents' home. And I think the videos pretty clearly demonstrate their state of intoxication, and I'll get to that a little later. I think that they're also significant in terms of supporting Cody's version of events. But what Cody said happened was that they got to her parents' house, they sat down on the porch. He either fell asleep or passed out, suddenly came to, told Sophia he had to get home, started walking down the sidewalk and was going to call his girlfriend, and was suddenly hit in the back with something, didn't know what had happened, turned around, saw a brick, and reacted by hitting the person who had hit him, and then realized it was Sophia. And the evidence does show that immediately he was crying out for help. He actually even said the neighbor, who was the first one who I think heard noises, said that she heard him crying, oh my god, what's going on, what's happening, which I think was consistent with his testimony that he didn't even realize what had happened, he didn't know who it was that had hit him, he realized it was Sophia and immediately tried to get her help. Sophia, well, actually, Judge Shiplett in his findings essentially said that after this night of excessive drinking between the two of them, who were friends and coworkers and had drunk together in the past, that Cody had decided, but not until he was at the front porch of Sophia's parents' house, that he was going to bash Sophia over the head so he could overcome her reaction. And he said, underlying the whole evening was an embitterment about her homosexuality and making her inaccessible to your advances. Now, curiously, by the time we get to the sentencing hearing, Judge Shiplett seems to have just tossed that conclusion by the wayside, and at the sentencing hearing he says, I feel like this case is one where there was no premeditation really at all. I don't see that Mr. Thomas had been plotting this from early in the evening. I don't know what tripped him, but it just appears to be a random act of extraordinary violence, but there was no premeditation that I can see at all. Now, I understand the triers of fact have the right to make inferences from the evidence, but the trier of fact's inferences have to be reasonable and the theory of the case has to be plausible. And there's several factors in this case that simply make the state's theory of the case and the judge's findings at the time of the verdict implausible and it's not a rational finding. There's, for example, the nature of the past relationship between Cody and Sophia. There's a behavior of Cody and Sophia that's pretty much agreed to that evening up to the point of the incident. There's a timeline really from the point where, in particular, when Sophia's last phone call to her girlfriend was made and to the point where people in the neighborhood first heard noises. And I'll examine that timeline a little more in detail. And then there's Cody's behavior after the incident where he immediately started calling for help and tried to get help for her. With respect to their prior relationship, everyone agreed that they had been co-workers, they were friends for years. Cody had always known that Sophia was a lesbian. There's no evidence at all that he had ever expressed any kind of hostility toward her status or any hostility toward any alternate lifestyle. He never, as far as the evidence shows, never had sexually harassed her in the past or made any advances toward her in the past, never had made any negative comments in general about homosexuality. There was evidence that he was making advances toward her during the evening that night. Sophia testified, well that I guess was the point of contention. Sophia testified that during the night in the bar and even while they were walking home that he was trying to grab her hand, that he was trying to kiss her, that in fact sitting at the bar he had kissed her. Cody said actually what happened was that she was making advances to me, he was very confused by it, he didn't understand what was happening. And I believe those videotapes, which is where I want to get into those, those videotapes actually are consistent with Cody's testimony that there was nothing on his end toward Sophia. There's one videotape which shows the cab at the Quick Sam's and the police coming and arriving and leaving. They leave, Sophia and Cody leave from there at about 1.45 a.m. And they go walking off across a grassy area toward Sophia's home. At that point, from my recollection, they're several feet apart. There's no effort by him at that point to try to grab her or reach for her or do anything. Now Sophia testified he was doing this the entire time, even as they were walking home. The next video starts at 1.46 a.m. when they are walking down, this is the area where they urinate. They're walking down the sidewalk and that video lasts about three minutes. Even at that point, they're walking an arm's length apart. There's no contact by him toward her, there's no effort to touch her or grab her. In fact, there's not even an effort by Cody to help her up when she falls over after she urinates and is trying to get up. There's no physical contact between them at all at that point, which is inconsistent with her testimony that throughout the evening he was doing this. The last phone call Sophia made to her girlfriend came in at 1.57 a.m. according to the girlfriend. One of the videos shows them in the area of 320 Westbrooks, I believe it is, at 1.57 a.m., which is about a block and a half or two blocks from Sophia's home. Is that the time as they approach an intersection? It's a very dark, you can see two people way in the back and I think the description of it says that they stop in the middle of the street and then head off in, I don't know, I think it was a southerly or westerly direction, but it's a dark video and you can see the street from some distance away. And it's at the point when Sophia makes the last call to her girlfriend, which goes to voicemail. So that's 1.57 a.m. They're at 320 Westbrooks, which again is about two blocks from her parents' home. According to Sophia, after that point, well, let me add, the next thing that happens with respect to other witnesses is that shortly after 2 a.m. a neighbor hears groaning and hears Cody's cries for help and he asks her to call 911, so that's a little after 2 a.m. And one of the police officers said he arrived at the home at 2.12. So at most you have a period of time from 1.57 a.m. to 2.12 a.m. when according to Sophia, what they do in that period of time is walk the rest of the way to her parents' house, they sit on the porch, they talk for a while about Cody's girlfriend, he's complaining about his girlfriend. Cody asks her for a beer. She, I assume, would have to have checked. She said they had no beer. Then Cody jumps off the porch. He's rooting around in the flower bed. She's wondering what he's doing. She jumps down to see what he's doing. She sees him holding a brick in his hand. She's saying, what the hell is he doing? But at that point decides to turn around and walk away. Then she says the next thing she remembers was pain and blood. And then after that there would have had to have been a period where she's lying face down on the ground and Cody, according to the state's theory and the judge's findings, is trying to pull down her pants and unbuckling his belt and pulling down his zipper and only at that point he sees this blood pooling around her head. And that causes him, apparently, to cease in his efforts to assault her and he starts calling for the police. It's hard to believe that all that could have happened in less than 15 minutes. It's also hard to believe that Cody would have been reaching down for someone who's lying flat on the ground trying to pull down her pants and not see this large pool of blood, which is what Judge Shiplett said induced him to start calling for help. And if he had enough presence of mind, I guess, to think, well, I'm going to bash her over the head with this brick so I can assault her, why would he not then have pulled her pants up if his intent had really been, why would he leave her in that position? I think it's very reasonable to find that what actually happened was both of that. You see them both on the video. Sophia is falling over, she has a hard time getting up, she has a hard time pulling up her pants. Certainly not unheard of that in a situation where someone is drinking too much and urinating by a tree that they may forget to pull up their zipper. His explanation for what happened and how it happened is more reasonable. Sophia's story doesn't fit with the timeline, it doesn't fit with their relationship, their prior relationship, it doesn't fit with Cody's behavior afterwards, and it wasn't a rational finding of fact by the trial judge. You said it's unreasonable to think that could take place in 15 minutes. How long would it take in your estimation? Well, I actually did some, I was using a lot of Google Maps and measuring distances between certain places. It takes them about 7 minutes to walk about a block and a half from where they stopped to urinate to the next time where, at 320 Brooks, and that was about a block and a half. So I think probably with their state of intoxication, it was going to take them longer than 5 minutes or so to walk the block and a half, maybe 7, 8 minutes. Sitting on the porch and talking, maybe another. And how long would it take to hit her in the head with a brick and try to pull her pants down? Oh, we're not disputing that he hit her in the head with a brick. In the timeline, how long would that take? Well, under what Cody said happened was he fell asleep, he was startled awake. That certainly wouldn't take a long period of time. I mean, from 1.57 a.m. to shortly after 2 a.m., yeah, they could have gotten to the steps, he fell asleep and was startled awake by who knows what, but that was only a few minutes. I think it's the point you look at is not just when he hit her, it's what all the events leading up to that were. And why would he do that? I guess, why would he do this? Well, why would he hit her in the head with a brick? I mean, trying to find reasons for any of this isn't going to work. But he did say, and I think it's supported by the evidence, that he did not realize who it was that had hit him. And I think that explains also why he's saying, he explained in his testimony too that it makes sense that he was walking away, leaving the area. He is hit from behind, doesn't know who it is, and he doesn't realize it's Sophia. And he said that may have been why I kept saying, I don't remember saying this, but that may have been why I kept saying it's a dude, because I didn't know who it was that had hit me. So there's no dispute he was hit? He didn't complain that he had been hit, but he said he had been hit. He testified that he had been hit. Any signs of injury from being hit with a brick? They did not present any evidence of that. But he, I'm not trying to justify, he didn't actually try to justify hitting her. What I'm saying is that it wasn't with the intent to commit an assault. He reacted, as Judge Shipwood found, he reacted in extreme violence. He certainly committed a battery, an aggravated battery. No one's disputing that. Well, but the testimony of being hit, there's no other evidence of that. Can that go to an assessment of credibility? No other evidence of? Injury in his head? Well, if you look at the clothing they were wearing, he was wearing, they were both wearing heavy jackets. I don't think it's unreasonable that he just got the wind knocked up. There's no physical evidence? Right, I don't think that's unreasonable. And certainly at that point, his concern is not going to be, oh, I might have a mark on my back. He realizes that he's seriously injured his friend, and he's obviously, it's apparent he's concerned for her welfare by his behavior after the... No, I'm just talking in terms of credibility. Right, right. Sure, I think it's perfectly reasonable that at that point his concern is not focused on, hey, I might have a mark on my back. But it might have been his concern a day or so later when he was sitting in jail charged with this crime that if he had a mark or a cut or a bruise on his back from getting hit, he might think about it at that point. You know, if he were seriously injured, he might have thought about that as a self-defense claim, but I think he wasn't, his attorney wasn't even trying to make a viable self-defense claim. He also, by the way, did, after the police first spoke to him, did invoke his right to counsel. So at that point, we don't really have any more come from him until the point of the trial. So I think this case is probably closest to the Yergin case, which I cited in my brief, and that's a case where there were some credibility issues. The complainant in that case actually expressly testified that these two defendants had sexually assaulted her and several times had sexually assaulted her. The appellate court looked at the physical evidence in the case, looked at her testimony, looked at the testimony of one of the defendants who explained the defense version of what had happened. And the court said, in fact, I'll quote them, the court said the events are too consistent with the defendant's theory of the case to be likely dismissed. And even though this was a case where this complainant expressly said these two sexually assaulted me, they said let's look at all the other physical evidence, let's look at the implausibility of some of her testimony, we don't believe that that's proof beyond a reasonable doubt. And I think in this case, too, the events are too consistent with the defendant's version of the case such that the state did not prove Mr. Thomas' guilt beyond a reasonable doubt. So we would ask that... Can you summarize what that consistency is in a nutshell? There's the fact that they had a longstanding friendship with no prior indication of any hostility toward her, no prior sexual advances toward her. Even Sophia said he was not acting physically aggressive toward her in the bar that night. She knew the bartender, no one at the bar said that Cody had committed any kind of sexual acts toward her. His behavior immediately afterwards, his behavior on the videos shows that there's no evidence of any kind of sexual tension between them on any of the videos. And we have a substantial period of time on the videos where she said that was happening the entire time and the videos don't corroborate that testimony. And then his behavior immediately after, his cries for help, his asking to call the police, he asked that the neighbor call 911. Those are all consistent with his version of the events. So that's an indication of lack of culpability, no flight, right? Correct. Okay. Thank you. Any questions? Oh, I'm sorry. I was just asking if there were any questions and if you have anything else. Oh, nothing, Your Honor. I would just ask that the conviction be reversed. Thank you. Mr. Austo? Can you please report? People first note the defendant does not contest his conviction for aggravated battery and therefore he's forfeit review of that particular conviction. And in his main brief, the defendant asserted that the people failed to show that beyond a reasonable doubt that when he struck and injured Sophia and Terry all, he did so with a specific intent to engage in forcible sexual intercourse with Sophia against her will. The applicable statutes do not require that the people show that he intended to engage in sexual intercourse or to prove that he struck and injured Sophia. The statutes only require proof that the defendant intended to commit a criminal sexual assault and that he did any act that constituted a substantial step toward the commission of that offense. In this case, the record shows that the defendant struck Sophia in the head with a landscaping brick, and that's a fact that the defendant admitted. The record shows that Sophia's pants and underwear had been pulled down at least to the point of her buttocks, and her stepfather said it was down to the point of her crotch. One police officer said it was down below her buttocks even. That act alone, you say, under the statute would show intent? It would. So we could depart from all this striking with bricks, right, in that act alone? Well, we have to have force or some act that goes along with it, but I can see your point, yes. The act of pulling her clothing down, especially when she was incapacitated on the ground, would be a substantial step, yes. And we also know that at that same time, while her pants were down, his zipper was undone and his belt was unbuckled. So at that point, the evidence showed that he had committed the substantial step toward committing the sexual assault of Sophia. In his main brief, the defendant asserted that his version of the events prior to and at the time of the attack on Sophia was more consistent with the evidence and more plausible explanation of what had happened, and that's essentially what counsel argued here. But in our brief, the people detailed the extensive bench trial testimony and showed that defendants' trial testimony and defendants' assertions on appeal are clearly contradicted by the physical evidence and the testimony of the other witnesses. Specifically, the testimony of the police officers shows that defendants' testimony was not credible and that he repeatedly lied at the time of the incident. The record shows, on the other hand, that Sophia's testimony was very credible. If she didn't remember something during her testimony, she said, so I don't remember that event, I was drunk. You know, if there was a specific fact that was not there. And during the questioning at the scene, the defendant also sarcastically said to the officer who was questioning about what had gone on, he said that he had not beaten Sophia and attempted to have sex with her. And this is even though the police officer at that time did not raise that as a possible scenario to him. He had not accused him of that at all. In his reply brief, the defendant asserts that it's not beyond the realm of possibility that on this night, Sophia decided to engage in flirtatious behavior that she would not have engaged in while she was sober. And this is the same defense that the defendant used at trial when he testified, excuse me, I've been sick recently and I'm starting to lose my voice a little bit, when he testified that Sophia told him that she wanted to have sex with him at the bar and that she even followed him into a bathroom at the bar. Sophia, as we know, is a lesbian. And her mother and her stepfather said that she's never dated a male. And the defendant also testified that he knew that she was lesbian and that they had never dated. And they were not close friends. They had been co-workers years earlier. They didn't have a lot of contact up to this time. Apparently, the defendant had somehow, it's not clear in the record how they had a phone conversation while she was at the bar, but he was the one that later came to the bar. She did not invite him there. And when he arrived, he saw her at the end of the bar and went down to her. Well, that isn't what was testified to. We don't really know, do we, that whether or not she doesn't remember if she invited him or not. It's not clear. That's correct. So it isn't clear that she didn't invite him. It's just not clear who invited who other than the fact that he did come there. Right. That's what I'm, the point is, you're right, the record does not show that clearly. But it is highly improbable that on this particular night, Sophia, whether she was drunk or otherwise, suddenly decided to flirt with or to try to have sex with a male. This is just not her history. Now, Sophia testified that at the bar, the defendant kissed her on the mouth and told her that he could turn her straight. This is not an unbelievable scenario. The defendant also tried to kiss Sophia as he walked toward her house from the store after paying for the cab fare. She did not say that he tried to kiss her or grab her all the way home. It was a few incidents that she testified to. Any questions? And curiously to me that because there is so much video that there isn't any indication that he's trying to hold her hand or he's trying to get her to have sex. I mean, she drops her pants right in front of him and yet he doesn't take that opportunity, which would seem like the golden opportunity. Now she's, you know, she's got her pants down, she's squatted down, she can't get back up, she falls once. I mean, it seems to me that there's some, you know, he's been trying to hold her hand and trying to kiss her throughout the course of the time they leave the bar, their walk to the Quick Sam's, their walk back. But that is not shown on the several minutes of video. It's only, I guess, happens when it isn't. But when they are in such close proximity, he doesn't do anything. Remember, Your Honor, these folks are drunk, both of them. And he dropped his pants, if you will, at least urinated in front of her. She did the same. It's not normal behavior, let's face it. They are drunk. But what happens later is the more important thing, I think, in why he would have been attempted to have sex with her. Part of what's been going on during the night is he's been complaining about his girlfriend, the mother of his children. They've been having a fight that day and such. She's been listening to him, commiserating with him and such. They get back to the house. They're sitting either on a stepper or on a swing, whichever version you believe. And she is, again, she's being empathetic toward him and such like this. At that point, he's drunk. I want to have sex with this woman. She's being nice to me. So he picks up. How am I going to do this? Pick up a brick, hit her in the head, have sex with her. That's a plausible scenario, actually. This whole situation is not normal because we're dealing with a drunken people. But we're not dealing with the standard of more likely than not, are we? That's correct. This is beyond a reasonable doubt. It's beyond a reasonable doubt. Yes. We have to remember also when Sophia is unconscious and she's bleeding on the ground, the defendant repeatedly told her parents and the neighbors who were there who had come onto the scene by this time, she's a dude, she keeps saying. Obviously, this is a woman on the ground. There's no male on the ground. He knows this. When he was questioned by the police officer who just saw them earlier at the convenience store at Quick Sam's, you know, about what had happened, he said, I was just walking by and I found her laying on the ground. No, he didn't. He'd been with her. The officer knew that. He'd just seen her. The security video, of course, showed them together walking home, urinating at the Knox College campus. And then the defendant's claim that Sophia hit him with a landscaping brick to prevent him from leaving the house is contradicted by her own testimony and by the fact that the defendant did not claim to the police officers that she had done so. And the defendant did not request any medical attention, even though they asked him if he wanted medical attention. They did the medical forms that are, you know, during the interviewing process and this sort of thing. And the police officers at the station, they didn't see any evidence that the defendant had been injured. And he didn't say at the time that he had any medical problems, even though he testified that it was quite painful at the time that this woundless brick hit him. It almost knocked him to the ground. At trial, he had excruciating pain, as the way he described it, in his back and his ankle. Well, if he was injured that badly, you would think at some point during the period of time that he would say something about being hit with a brick if it happened. This is not credible. This also contradicts the conflicting stories that the defendant told the police. You know, he said that he had been walking by, he found her on the ground, and then he also said that she had fallen and hit her head. This makes no sense. If she had fallen and hit her head, how is she going to pick up a brick and hit him? The people submit that the evidence proved beyond a reasonable doubt that the defendant committed an attempt, aggravated criminal sexual assault. All of this is not credible as to how or if she was hit by a brick through his own hands goes to battle. Where do we get the intent to commit sexual assault? What is it? All this other stuff is, you said, well, there's these conversations at a bar, topical conversations being testified to. If believed, if he has credibility, if he has no credibility, then it's not really being believed, is it? Correct. Okay. So, what do we have in terms of non-testimonial by either party that there is a sexual, as opposing counsel said, sexual tension occurring between both or by one person? Sexual tension, you're saying? Yes, because you're going to need that as an element, aren't you? Well, we... I mean, to try to get at intent? Sure, sure, but we have him at, if we're believing, you know, it's a credibility issue, of course, between these two. Right, but let's take the credibility out of it. I said non-testimonial by either party. Okay. We have videotape. Is there anything there, or is there third-party testimony of any of that? Not in the videotape as described. We don't see them having sex or kissing or holding hands or anything like that. We do have some DNA evidence that hasn't been discussed, where his DNA is on one of her breasts. Her clothing is pulled up also, her top and her pants. There is also, his DNA could not be excluded from some gum that was found apparently under her nails. I don't know how the gum got under her nails. There's no testimony regarding that, but they could not exclude his DNA from that gum. So if he had kissed her while she was chewing that gum, as she claimed, then that's why that DNA may have been there. So we have that physical evidence also. We don't really know that that is his DNA, just that he couldn't be excluded. And we know that there's a lot of touching between them going on after the battery and, you know. But isn't the whole problem with all of this, it's an issue of credibility, is they're both so drunk, neither one of them really knows what happened or what was going on. They think they remember something and, you know, obviously her recollection or what she says she calls is almost a year later. Well, for both of them it's a year later, Your Honor. And certainly the credibility of anyone who's drunk is suspect to some extent, but it doesn't mean that their testimony is false or incorrect. It just means you have to review it with that fact in mind. So really what you do have is the disrobing or partial disrobing of the alleged victim in this instance, right? That's one clear sign that he was attempting, and his own fly being unzipped and his belt being undone. And his partial disrobing. Right. So we don't, obviously it's circumstantial, we don't have any slam-dunk evidence that says this happened and everybody can say, yep, that did. Initially, right, she's face down. Yes, she is. And her pants are baggy. I don't know about baggy, Your Honor. I don't recall that. I'm sure I read in both sets of briefs saggy and baggy was the definition, and then she can't even get her own pants pulled up. Then she does, she falls down and gets them back up. We don't know if he does his buckle or not. I mean, I guess the whole, I'm not sure about her pants ever being pulled down by him. She's face down, you know, there's soup to nuts all there. Somebody said it's just her, you know, top of her buttock showing. Somebody said it's all the way down to her crotch. Then it's her stomach showing. Well, she's had to have been flipped over after, I mean, she's found face down by her stepfather. I mean, that's his initial. And then they talk about her stomach showing. I mean, you can't have both. I mean, somebody had to turn her over after the 911 call or the call for help or something. And, you know, I just, I know his pants seem to be zipped or unbuckled. But all of this had just, they were all in the same state of undress just a few minutes before. And I don't know that we have them then being redressed in a pristine state with the level of intoxication and then a second pulling down of the pants of hers by him and then his own unbuckling. I don't know that we have that so clearly established. Your Honor, I think if you very carefully, it's a difficult video to watch, I admit. The Knox College video where they urinate on the tree in that area, if you look at that several times and really look for what the actions were, what happened. Yes, she falls down. What does she do after she falls down? Pulls up her pants and it appears then, if you're watching carefully, that she completely, you know, buckles her clothes back up, zips back up. It's hard to see him. He's in shadow. I watched it over and over and it appeared to me that he did zip. But again, I'm not going to swear to that. I'm just saying that's what it appeared to be on the video. But when you see them walking away, neither one of them are pulling up their pants or they're walking as well as drunk people might. There's no indication that their clothing is... That they're still disrobed. Right. Okay. Right. Any other questions, Your Honor? And we ask that you affirm the convictions and sentences. Thank you, Mr. Hostow. Thank you. Ms. Skelnick for rebuttal. It does, in fact, appear in this case that the reason that Judge Shiplet found this intent to commit an assault related to Sophia's pants. Does that... Isn't that really the issue? I mean, ultimately, that you have? There's no dispute about that, apparently? Well, there is a dispute because... It's only like when did it occur, right? No, I think there's more to it than that. Opposing counsel says Sophia's pants were pulled down. I don't know that we can necessarily say that. Sophia's pants were partly down. But when you look at the testimony of all the witnesses who live in the area, there's different descriptions of what they see. In fact, her mom says her pants were coming down a little bit. A neighbor said her pants were down a ways. Another neighbor says her pants were down past her waist. By the time the officer gets there, he says, oh, her pants are below her buttocks. Well, again, that's consistent with what the neighbors are also testifying, and her parents are testifying to, they see Cody doing. Cody is trying to lift her up. He's trying to pick her up and pulling her up and saying, you're okay. You'll be okay. You'll be okay. If her pants were already somewhat partway down because she hadn't securely fastened them, that's why there's these different stages that these witnesses are testifying to as to a description of how far her pants are down. What difference does that make? The fact that they were down any could go to the intent to commit a sexual assault. It could if there weren't other factors in this case that show that, you know, the opposing counsel says, well, why would she, after being a lesbian her entire life, why would she suddenly want to have sex with a male? Why would Cody Thomas, after being friends and partying with her and knowing she was a lesbian, never expressing any kind of sexual interest or sexual hostility, the judge found it was an act of hostility because she got hit in the head. Why, after six years, would he do that, and why would he choose to do this in front of her parents' house? It's just not a rational scenario. It's not a reasonable scenario. Of course he's going to distance himself from what's happening there because she had a serious life-threatening injury. And I would say, and I went over this in my reply brief, but the state again- So he's trying to extricate himself from, in your view, not a sexual assault charge but a battery charge. Correct. And the state says again, and I think Judge Shipp will have found that his comments to Officer Wingbegler was tantamount to a confession when he said, as the officer said, in a very sarcastic tone, yeah, I tried to have sex with her and beat her. Is that what you're trying to say to me? And the state says, well, nobody had accused him of anything before he made that comment, which is completely untrue. The stepfather of Sophie had walked up to the officer who was talking to Cody saying, my stepdaughter is gay and her pants are partway down. There's something not right here. The officer looks at Cody. He says, why are her pants down? And then he says, why is your zipper unzipped? I don't know how else anybody could take that other than that he was being accused of trying to sexually assault his friend. So he's saying, is that what you're trying to say to me? That's not a confession. That's like, come on. He said after that, come on. Everybody knows she's gay. So that's actually a denial of any intent to commit a sexual assault. With respect to comments about the defendant testifying about excruciating pain, I read that section of the testimony a couple times, and he's talking in the present tense at that point. It's not related to the being struck in the back by an object. There's no explanation. Why would he say I have excruciating pain in my ankle? He never claimed he had any injury to his ankle. He's saying, I have excruciating back and ankle pain, but it's not related to the past incident. I'm not really sure why that question came out or what the point of it was, but it wasn't related to the point where he was injured or struck, rather. He really never claimed at trial that he suffered any kind of serious or permanent injury from that. Thank you. Your Honors, if you look at all the evidence from all the witnesses, you look at the videotape, even Sophia doesn't say he ever tried to do anything to remove her clothing. I think also there's an explanation for if he was lifting her up, there's another explanation for why his DNA may have been found on the upper part of her body. He was trying to get her up and trying to tell her she would be okay. The state's theory of the case, the judge's findings, just don't make sense under all the circumstances of this case, the past history of the two individuals, his behavior after the incident, and the state did not prove beyond a reasonable doubt, proof has to be beyond a reasonable doubt, that he struck her with the specific intent to sexually assault her, and that proof is lacking. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible. Right now we will take a quick recess.